Thank you, Judge. May it please the Court, Michael Miller for Appellant and Plaintiff Below, Namespace Incorporated, and I'm going to do my best to save three minutes for rebuttal. Your Honors, this is an appeal from a motion to dismiss what is primarily an antitrust complaint, although there are Lanham and Trademark claims in the case as well, along with certain related state law claims. With one exception, Namespace's claims were dismissed below without prejudice. That one exception would be the Section 2 claims, which were dismissed with prejudice on the stated ground that no amendment could correct the fact that the defendant's market power was thrust upon it by a grant from the Department of Commerce. And the plaintiff in this case is an entity that was foreclosed from competing in the relevant markets. Well, let me ask the question. What market is the defendant in that your client is in? In other words, it seems to me they're in different markets. Your client is in the business of selling dot-somethings to ultimate users, or at least distributors of ultimate users, and the defendant is in the business of producing dot-somethings. So it's a widget manufacturer and you're a widget seller, if you want to make it in all terms. How is it monopolizing the market that you're in? They don't seem to be in that market at all. Your Honor, this is a case based on an unusual set of facts, and I think it drives the analysis here, the facts do. So I think we agree with the defendant that in a normal case, the rule is that in order to monopolize a market— One must be in it. One must be in it. One must be— One must be a competitor of yours. A competitor— It's hard to monopolize a market that you're not in. Yeah, right. So if I can back up for a second. So we recognize that, and it's the unusual, the unique sets of circumstances that drive here. So let me start with what I think is common ground here. Well, I guess my worry about that is, why didn't you please plead a conspiracy to monopolize? Your Honor, the allegations necessary to state a claim— So I—they might be. I'm not saying they are. But I guess I'm trying to figure out why you didn't plead it. Your Honor, we stated the underlying allegations of a claim for conspiracy to monopolize, and we brought a Section 2 claim broadly. Admittedly, in the claims, the phrase conspiracy to monopolize does not exist. Even if you had brought a conspiracy to monopolize claim, and I'm not clear what its parameters would be because I'm not sure who you would be accusing of monopolizing, don't you have the same Twombly problems that you had with your Section 1 claim? The district court said you really haven't—and Twombly was an antitrust case. You really haven't alleged enough for me to find that it's plausible that people conspired together. There's a motive, perhaps. They met together. But where's your evidence of conspiracy? I'm glad that you asked the question because that was my next exact question. Even there, it seems to me that Twombly is your problem. Well, let me deal with that issue, and then I'll go back to the competitor issue. So this court in Kendall stated that a plaintiff's obligation is to plead facts, quote, to give a defendant seeking to respond to allegations of a conspiracy an idea of where to begin. Sure, and I don't like Twombly, and I don't like Iqbal, so let me put that under record. But there are antitrust cases where the allegations seem to be very close to the kinds of allegations we have here. How did you get past that line in this case? We know the principle, but what allegations did you make that nudged it, as Chief Justice Roberts said, past the possible to plausible? So let me state first what is a distinction between the Twombly case and this case, and then second, what we pleaded that we think would have satisfied even Twombly. Now, Twombly was a case in which there was unilateral conduct. I'm sorry, I shouldn't say unilateral there. There was conduct in the marketplace by different actors, and the question was what explained that conduct, and what was required in Twombly were allegations that made a conspiracy, that is, what drove the separate conduct plausible. To be sure, in this case we have an allegation that a single entity, if you will, has conspired, notwithstanding the fact that it appears to be a single entity, it's a conspiracy. And so my question is, what have you alleged, what facts have you alleged to make it plausible that this isn't a single entity, but rather a conspiracy? And if you will, just to add to what he said, because it seems to me you've alleged that there are potential conspirators, namely the directors. There are times and locations of board meetings, and there's a 2012 application process that made your business model difficult. That's the only thing I can find in there you've really alleged. Well, let me talk about what was alleged as to the conspiracy. What we've alleged is that ICANN and individual members of ICANN who were moving out of ICANN into the private sector as well, that's alleged in the complaint. Right, they have conflicts of interest in your view. Conspired with non-ICANN members of the board and adopted the 2012 application round. I've read the allegation. That's a naked allegation that what occurred in this process was a conspiracy as opposed to a normal action of the board. What facts have you alleged that lead me to think that it was a conspiracy rather than merely a normal action of the board? Okay, but if I could just pause for a second on that distinction. What we've alleged are individuals, both inside and outside of ICANN, that made a decision together. Let's not talk about the motive or the conspiracy for that. That is the agreement, that is the conspiracy part of this that has been alleged. Now I think your Honor's question is, well, okay, but gee, they're just making a decision. They're on the board. Why do you believe, what makes it plausible that this was an unlawful conspiracy, an unlawful joint conduct? And what we've alleged in the complaint is the enormous financial interests. That motive, you've alleged motive. Which is not enough standing on a loan, but it is a factor that needs to be considered. No factor is enough standing on its loan. So you have this motive. What you see is a process that benefited particular entities that were represented on the board and that we have alleged in the complaint were part of the conspiracy. So it's a little bit more than the usual motive of, gee, it's a conspiracy to raise prices because everybody likes higher prices if you're a seller. This is a little bit different. It's a little more specific, and I would respectfully suggest a little more plausible, that these individuals, as they move in and out of the ICANN board, are benefiting their own financial interests. Now, what we also have is, the proof is in the pudding, what we see and what we have alleged is that only a few entities were able to participate in the process. What we allege is the very same entities who were part of the alleged conspiracy. The district court below referred to the number of applications and said, gee, there seems to be a lot of them. That shows there's competition. But the complaint specifically alleged that it was only a few entities that were permitted. Well, it's not permitted. It's only a few entities that you contend that can afford, according to their business models, to participate. There's no exclusionary rule here. You're correct. You're absolutely right. Permitted in a practical sense, which involves the application fee, which, given the history of this process, was extremely high, inflated, and what we've alleged is that was for a purpose, not just the price, though, of the application fee. But on the face of it, it's $185,000 or something like that, right, to apply. Why can't a producer, a manufacturer, if you will, of something say, we want to make sure that people who buy these have the wherewithal to deal with this process once they buy them. We worry that if we just give them out like candy, we're going to have abuses out there. And so we want people to have a substantial stake in buying these so that they will protect them and do the right thing with them. So that may not be a good business model, but it's at least a reasonable business model. How do we infer just from the fact that prices are high that this must be a conspiracy to exclude people? That may be a defense, by the way, when you get past them. No, but if I look at all your facts and try to figure out why it's plausible that this is a conspiracy, I was telling people last night I tried to buy a handbag for my wife at a store. And I went to the store and they said they only give us ten of these because they want them to be rare and we don't have one. And so I couldn't buy it there. And that was their business model. So what's wrong? Why is that plausible that that's an antitrust violation? Let me say two things that are in the complaint that make that plausible. The first is we specifically alleged that the application fee bore no relationship or reasonable relationship to a purpose such as Your Honor just described. That's not enough to prevail at the end of the day, but it's, we believe, enough to get past the motion to dismiss stage. But in addition, the complaint goes on at length about the history of GTLD delegations, and not only the 2012 round, but the earlier round. And that history gives a few allegations. It's a much, much lower price. So, Your Honor, the justification that you just described would have applied in 2008 and 2012. They changed their mind. They sold them at $50,000 14 years ago. I could buy cars much cheaper 14 years ago, and now they're selling them for $180,000. That fact doesn't get me towards conspiracy. It gets me towards high pricing. But, Your Honor, we would suggest it makes, at this stage of the proceedings, that allegation plausible. But in addition, what we also alleged is the nature of Namespace's business model disclosed in those earlier rounds, which posed a threat to the established players, and that there's a specific allegation that that higher price, not only did it bear no relation to any justifiable business case, but was designed, that's the allegation, was designed. No, it's the allegation, but you have to have facts under Twombly as opposed to allegations that make it plausible that this was a big conspiracy. And it's the, you're right, Your Honor, it's the totality of the circumstances, the financial interest, the lack of representation, the other rules, not just the price, the limitation to one GTLD per application. What we would, what we've alleged is that the totality of those facts, not just one, not just the price, not just the limitation, not just the coerced release, the totality of those facts, when you look at who the board is and who they are, when you look at Namespace's business model and the prior relationships, all of that is enough to make the allegations of conspiracy plausible. Could you open your own route? I apologize, Your Honor. Could you open your own route? The market we've defined is a GTLD with access to the DNA. No, I understand that. I asked a different question. Typically in a case, typically in cases involving antitrust issues, if people don't like what people are selling, they go open up a new market. And so my question is, could you open an alternative route? We have alleged in the complaint that that's not feasible. I don't have. Have they done anything to protect you from doing that? Has ICANN done anything to protect you from? I don't think so, Your Honor. I don't think so. I'm getting past my technical capabilities here. What I'm not clear about is the role of the United States government, which in part, if I could just go back to the first question, which was why are they a competitor in this market? And I talked about how this is unique, and I thought there was some common ground as well. What I think is common ground, it's recognized by the district court and recognized by ICANN, is that the Department of Commerce gave ICANN a monopoly position in these markets. And we think that puts ICANN in these markets for purposes of the case law that requires a monopolist to be in competition. The DOC did not give ICANN regulatory power over the markets, as in the Peninsula ambulance case. I'm sorry, I'm blanking. The ambulance case that was cited by ICANN. It's not regulatory power. And it's not like the old Northbrook case where ICANN is in a separate market like the DTC was and had a monopoly position. This is a market that the DOC – sorry, it's Mercy Peninsula, I just recalled. DOC gave ICANN a monopoly position in this market. There's no market until ICANN, who has the power to control that market. It's all them until they delegate. And that led back to the question Judge Smith asked at the beginning. Yes. The DOC could have kept control of this market for itself, I think. Yes. Because the government invented the Internet. Right. Or Al Gore did. I won't make a comment on that. Yeah, okay. Well, I did, Vice President Gore. Yeah. So the government could have kept control of this process. Yes. It decided to privatize it. It gave it to ICANN. And what I'm having difficulty with in your argument is it gave ICANN the same authority the government would have had, which is I'll decide how many of these to sell and at what price. But you say with that monopoly position came the responsibility to be in the markets? That's where I'm having difficulty. Well, it gave the fact that they were in the markets. Well, no, it made them, in my analogy, the manufacturer, didn't it? It made them the government. They're not claiming immunity because of that, but it made them, in effect, the government that doled out the dot somethings. It seemed interesting that you said they weren't the regulator. To me, they're at least the administrator. But importantly, and it was raised in Judge Horowitz. My worry about that is you said they weren't the regulator. It seems to me they're at least the administrator in this. Your Honor, but I think what's important, whatever you call them, maybe you can call them the administrator. I mean, you're the one that says they're not the regulator. But I think the important point there is that, in a way, they are not the government. They are not standing in the shoes of the government. Congress and the Department of Commerce expressly stated, repeatedly, that ICANN would not be immune from the antitrust policy. No, and they're not claiming it. They're not claiming it. That's an important point. They've still got to be a market player in order for you to get there under Section 2. And, Your Honor, we think the facts of this case where the DOC gave ICANN a monopoly position, which the district court in ICANN says, what else could that mean but that they are in the market? To say that they were given monopoly power in these markets. Doesn't it just mean they're in the market of distributing dot-somethings or creating dot-somethings, if you will, not in the market of selling them down the – they're at the top of the distribution chain and your client's farther down? Your Honor, we don't think so because this market, which is the market for GTLDs with access to the DNS route, they are not simply selling. This is like that Tate case where they are expressly refusing to sell certain GTLDs, only the ones that they want to. So to the extent they are not selling those, well, they are still in that market. They are the portal to that market. They are in the market. It's very unusual. It's very different from the other cases which hold that you need to be a competitor in the market in order to have Section 2 claims stated against you. But we think on these facts, it's enough. Before you sit down, I want to ask you about the Lanham Act claims. Yes. Why are they ripe? If somebody ever starts using something that your client thinks that they have intellectual property rights to, you can move ahead. But there's no evidence yet that anybody has started using any of these domain names, is there? You're right, Your Honor. We would have a claim against that entity who uses. We also think we have a claim – it's a different claim – against an entity who says, I am going to sell your domain name. We think that alone is outrageous. But at this point, what damage do you suffer from their sale? Well, if you can imagine, we own these trademarks, and we have ICANN saying, I am going to sell your trademark. But they haven't. And that's the disruption. But they haven't yet, right? At the time of the complaint, they were only – they had not yet done so. Okay, and that's all we can deal with here. But even the announcement of, I am going to sell your trademark, interferes with their trademark. The announcement that I might interfere in your intellectual property rights in the future gives rise to a ripe claim? With respect to trademark, if there's a disruption – and this ties in with the state law claims as well – but if there is a disruption in our trademark, then that is unlawful interference with the trademark that is ripe. Your Honor, I'm happy to answer questions about rebuttal, but I do think I'm out of time. Thank you. Thank you. May it please the Court, I am Jeff Levy of Jones Day on behalf of ICANN. The Court covered directly many of the issues that I had intended to cover, so I'll respond to some of those issues and address additional questions that the panel has. First, ICANN is an administrator, Judge Smith. It is not a regulator. It does administer the domain name system. It is not in the market for selling top-level domain names. And so if any of the three of you wish to operate judge.com or any of the new domain names that might come online, you cannot go to ICANN and obtain that name. We have to buy it from somebody. Go to GoDaddy or Network Solutions or one of the registrars that ICANN has accredited. Right. But isn't the board of ICANN made up in part of people from whom I would have to go to buy this? In small part, yes. Okay. I'm not sure they've alleged this, but let me make it different. This is a hypothetical. Okay. Let's assume that they allege that there was an influential group of those people, Namespace's competitors who were on the board and who got together and said, we can run this operation in such a way that we'll be the only people that ever get to sell these things. And they reached an internal agreement of that and it influenced the board to make those decisions. I don't see those allegations here in that form, but if those were made, would that be an antitrust violation? I think if there was a sufficient allegation that Namespace's competitors actually got together and said, we want to stop Namespace and their so-called business model from being able to compete, and we're going to set the rules for the game in such a manner that all of us are okay. But they're not. But they're not. I think maybe that might be able to stay at that point. Okay. I think it would, too. And now my next question, of course, is, construed liberally, why isn't that what he alleged here? It's not even close. What he alleges, what the complaint alleges, is that four members of the ICANN board have conflicts. There's no allegation that those conflicts have anything to do with Namespace. He just alleges basically that those four members of the board, one of whom has left the board, does business in the ICANN arena. That's the full scope of paragraph 61. The complaint doesn't allege that those people thought about Namespace when they were setting the price, that those people thought about Namespace when they were establishing the guidebook. And then in paragraph 66 of the complaint, he lists the regularly scheduled meetings of the ICANN board. And this is outside the record, but I'll note for what it's worth that those board meetings, that the transcripts are available online, so anyone can see what it is the board talked about. But instead, what we have in paragraph 66. No, the allegation is simply the people met on those occasions. Correct. That's that policy. And the times. Right. Yeah, and, well, a corporate board is supposed to meet. That's what the board does, among other things. And so the fact that we have four board members who have some unclear conflict, but it doesn't relate to Namespace, and those four board members then alleged, then attended, regularly scheduled meetings of a not-for-profit board, those allegations aren't anywhere close to pleading the facts that Kendall requires. Does the record disclose whether the Department of Commerce, I know it made suggestions as to the composition of the board, would the Department of Commerce set down rules as to the composition of the board? The record does not address that. I can tell you as a factual matter the department does not have. Right, but it did, I know when it created the, when it first transferred the rights to the entity, if you will, it made some suggestions about. The composition of the board. Correct. In 1998, when Dr. Postel, who was the person who, in essence, was organizing ICANN, when he was forming the first board, he was very much in contact with the Department of Commerce and other members of the Clinton administration to vet those candidates. But the path. There's some reference in the briefs, and I was trying to go back to the record, to the notion that some of these conflicts of interest were built into the department's request that people in the industry be on the board. Well, and so the complaint does refer to the privatization of the domain name system. And what the Clinton administration decided in 1998 was that the government should get out of the business of running the domain name system, but they did not want governments, translation, the United Nations, to run the domain name system. And so they asked industry to create a system which has what we refer to as bottoms-up policymaking. We have a number of constituent organizations, and those organizations generate policy recommendations to ICANN, including specifically with respect to the program that the plaintiff doesn't like. And ICANN then adopted various policy recommendations. In this instance, what was adopted was that rather than having a very limited number of additional top-level domains, which was the purpose of what happened in the year 2000, the plaintiff applied in the year 2000, and it doesn't say this in the complaint, but the announcement that ICANN made in the application was this was for what we called proof of concept. In other words, let's add some top-level domains to the Internet and make sure they don't break the Internet. We added seven or eight names, .museum, .info, .pro, .biz. They worked successfully. The Internet was secure. And so many years later, a policy organization said, we want to have an unlimited number of additional domain names. And again, it's not in the record because it's not in the complaint, but the plaintiff knows ICANN received 1930 applications for new top-level domains. I couldn't put that in the record because it's not in the complaint, but that's the fact. Is there, and the record may not reflect this either, is there a reason why the Internet can't be open, in effect, to anybody who wants to have a name? No, but what ICANN did do, well, there's the concept of a name, judge.com, and there's a concept of a top-level domain. Right, and I'm really talking about the top level. Correct. What occurs after the dot. Yes, Your Honor speculated that ICANN set the fee high because they wanted to make sure that the applicants had the wherewithal to be able to operate a registry on the Internet. And that is exactly a primary reason why the fee was set high. I should note that setting a high fee, and that's really what this case is about, is absolutely lawful, even if ICANN was a monopolist. And under Trinko and lots of other cases, a monopolist can set a high price. It has to do something more than set a high price in order to violate Section 2. But here, the district court ruled, based on the allegations of the complaint, that ICANN had not willfully acquired a monopoly by signing a contract with the Department of Commerce. I don't think anybody contends that ICANN illegally acquired a monopoly. It's a natural monopolist in effect. ICANN is a natural monopolist, but the market that it is monopolizing, as it were, is the market to administer domain names. One entity, the government decided, should be the only entity to administer the system, to decide who gets additional names, to decide who gets to register those names, to decide who gets to operate the country code top-level domains that are throughout the world. That entity today is ICANN. So it is not competing. I'm going full circle to one of the questions that you had asked, Mr. Miller. It's not in a market that the plaintiff is in. The three so-called relevant markets that are referenced in the complaint, ICANN isn't in any of those markets. Its bylaws don't permit it to be in those markets, and we provided that information to the district court and we also provided it to this court. Can you address the Lanham Act claims? As I understand it, the allegation is they have copyright interests, I take it, or trademark interests in certain domain names, Hurwitz.Reinhart or something like that, and you've purported to sell, you've purported to make those available to people to buy. Is that a fair summary of the complaint? Well, not at the time of the filing of the complaint, no. At the time of the filing of the complaint, and I think it was accurate what the plaintiff said, the plaintiff said ICANN has accepted applications from third parties that wish to operate some of the top-level domains that are also in the alternative internet that the plaintiff operates. Right. And at the time that the complaint was filed, ICANN had accepted applications from some number of applicants for the same strings. When you say accepted applications, that doesn't mean it had granted the contract. No, and in fact, at the time the complaint was filed, ICANN had not delegated. So ICANN receives applications. It then spent a year evaluating the applications. In many instances, there were multiple entities that applied for the same name. One of the plaintiff's names, with all due respect to the court, was .sucks, which may turn out to be a popular name for people who are in opposition to something. Well, ICANN received multiple applications for that particular string, and then there's a whole process that gets... So when this motion to dismiss was before the district court... Nothing had been done. Right, and the district court said if something gets done, come back and complain, but in the meantime, the fact that people have applied for them and you haven't rejected their applications out of hand doesn't... Correct. I wanted to make sure I understood the procedural history. Now, the district court did not address, because of the rightness argument, the second argument that we address in our briefs, which is use in commerce. You can't... Even assuming that the plaintiff has lawful trademarks, and we have to assume that because we're at a Rule 12b-6 motion, ICANN would have to use those marks in commerce. Yeah, but that's beyond the face of the complaint, isn't it? Well, it has to be alleged in order to state a claim that not only is ICANN imminently going to use those marks, but that those marks would be used in commerce. There are cases that are cited in the papers that talk about people setting up domain names in order to criticize other people. It doesn't have anything to do with commercial use. And the courts say, well, that's not trademark infringement because you're not using it in commerce. So it's in the papers that the parties presented to both the district court and to this court. The district court did not rule on the use of commerce because... Right, because that's not a rightness claim. That's just a failure to state a claim. Correct. But my point is that the complaint also does not allege a use in commerce. It would have to allege, for example, ICANN is advertising that it or somebody else is going to sell names in one of the strings that the plaintiff also has. It doesn't allege that. And the reason it doesn't allege that is ICANN doesn't do that. So there's a dual failure on the trademark claims. Failure one is that they're clearly not ripe. Failure two is that if one day they became ripe, the plaintiff would still have to allege a use in commerce, and that use was never alleged. I have a different kind of a question, which is procedural in matter. As your opponent got up and suggested, and I understood, the district court dismissed all the claims with the ability to refile except the Sherman Section 2 claim. Correct. And that that was with prejudice. Correct. Why was that a claim that ought to have been dismissed with prejudice when there might have been a chance to file under Section 2, a conspiracy to monopolize? Well, I don't know. Is that before us? Yeah. I don't see how that's before you because I don't know. I mean, I don't know that it is. Yeah, but that's one thing I wanted you to talk about. I don't see how Judge Andrews said. Frankly, when I read Section 2 claims, even if I agreed to with you, there was no monopolization claim. I don't know that one could say on these facts there's no conspiracy to monopolize claim, and if, in fact, there is one, then I'm back to Trombley, as I said before. Yes. I think there are two answers. First, the conspiracy, well, three answers. First, the conspiracy claim, of course, is not in the complaint. And they didn't respond to the motion to dismiss by saying, let us amend Section 2. Correct. And so I don't see how the district court could have anticipated the theoretical possibility of that claim. I wasn't sure my colleague was going to help you out as much as he did. I just wanted to hear what you had to say. Well, but could I also? I wasn't sure. I mean, I didn't know he was going to help you. That was really a question, not a statement. I thought it was true, but I wasn't sure it was true. Well, but could I augment the very good answer that your colleague gave, which is that the court did allow the plaintiff leave to amend on all of the other claims. They did. And so the plaintiff could have come forward and said, not only do I have amendments that add facts under Twombly with respect to the Section 1 claim and the tortious interference claim and maybe the trademarks claims, but I have a new cause of action that I would also like to allege. And that cause of action was not dismiss with prejudice because it wasn't in my initiative. Yeah, although I like my answer better because I'm not sure you can go back to the district judge at that point and say, I know you dismissed this one with prejudice, but would you give me another shot at amending? Would you give me another shot at Section 2 claim? Yes. Well, and the third answer is I think the dismissal with prejudice was accurate because there's no market that ICANN is monopolizing. There's no injury to competition that the plaintiff had alleged, and ICANN was given its alleged monopoly pursuant to contract with the United States. So I think the district judge may well have looked at all of those arguments, each of which is independently dispositive and said, I'm not going to allow leave to men as to the Section 2 claim. But of course, we don't know what was in his head. Thank you, Your Honor. Your Honor, I don't have any time left. Can I respond to the amendments? Yes, we'll give you two minutes to. Thank you, Your Honor. I appreciate that. Your Honor, the claims were dismissed other than Section 2 without prejudice. So to the extent it is possible, as Counselor for ICANN stated, to go back, file another complaint and say, I'm going to add a claim that was not dismissed with prejudice, and that's conspiracy to monopolize. Plaintiff remains free to do that. But for our purposes, since you dismissed your complaint, after being given the opportunity to amend it without amending it, for purposes of today's review, we can't say, well, I guess I can think of facts that he might make to amend. Can we? Well, here's why you can do that on the Section 2 claim. Your Honor, the district court stated in its order that it would dismiss the Section 2 claim with prejudice, without leave to amend, for one reason. And that is that the Department of Commerce thrust the monopoly upon ICANN. Our response to that is that's an error because this is a maintenance claim. Well, but if you were only making a monopolization claim as opposed to a conspiracy to monopolize claim, then the legal acquisition of the monopoly would be a complete defense. Your Honor, only monopolies that are forbidden under Section 2 are those that occur because of illegal conduct. But unlawful maintenance is also a Section 2 claim, and that's the claim we asserted, not acquisition, but maintenance. But that's a market issue again, isn't it? Because the maintenance, they're required by law to maintain what they do. The question is are they in your market? Well, let me turn to that because Counselor for ICANN stated that if you folks want to go to Judge, if you want to get Judge.com, you need to go to GoDaddy, not to ICANN. True. If you want 9thCircuit.judge, you have to go to ICANN. ICANN administers the GTLD markets. I think I stated, I think administrator is a fair characterization. But we've decided already how it's supposed to do that. We've already decided how to do that. It's to do it in compliance with Section 1 and Section 2 of the Sherman Act. Your Honor asked could we have an open market. Yes, we can have an open market. If ICANN stops making decisions based on, as is alleged in the complaint, a desire to only allow the big corporates, the people with financial power, the entrenched members of this industry to participate in the industry, well then, without that, without ICANN opening the markets, that's what the antitrust laws require. That's what we complain about in the 2012 application route. Not just price, a whole series of things. The closing of the Internet without justification. It may be that ICANN has a justification and that they'll share that justification with us in this case in discovery and on summary judgment. But right now, with this complaint, we would respectfully submit, we've done what we can to create a totality of the circumstances, the factual allegations, which together, and also the question that's in the complaint, which we raised too, why can't the Internet be open? Together, what this all suggests is a claim that survives Twombly. Thank you, counsel. The case just argued will be submitted. The court will stand in recess.
judges: Reinhardt, Smith, Hurwitz